**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LYNNE RUSSELL,<br><br>                PLAINTIFF,<br><br>      V.<br><br>MARMON HOLDINGS, INC. AND CABLE<br>COMPONENTS GROUP, LLC,<br><br>            DEFENDANTS. | CASE NO. 3:26-CV-00641<br><br><br>**JURY TRIAL REQUESTED** |

**COMPLAINT**

Plaintiff Lynne Russell, through her counsel, respectfully submits this Complaint against Defendants Marmon Holdings, Inc. and Cable Components Group, LLC, and in support thereof alleges as follows:

### I.    INTRODUCTION

1.    This case exposes callous corporate retaliation. Defendants devastated the career of a whistleblowing executive who repeatedly raised concerns about potential customer fraud and related product safety and integrity issues impacting cable infrastructure the public depends on.  When Plaintiff Russell discovered that her employer was shipping non-compliant materials to key customers, placing at risk critical infrastructure, she followed the ethical guidance the company posted, and courageously reported these violations.  Ms. Russell was acting in good faith to perform her job, on behalf of Defendants, ethically, while ensuring that cable products

1

used across numerous key modern utilities were not compromised for the public that relies on their functionality.  In response, Defendants chose to shoot the messenger.

2.      The retaliation was swift. Company leadership threatened Ms. Russell's career, excluded her from essential meetings, and appeared to alter company documents to conceal the violations she had exposed. The escalating workplace hostility and intimidation created such severe stress that it triggered a debilitating flare-up of Ms. Russell's systemic lupus, a chronic autoimmune condition.

3.      Defendants delivered the final blow by terminating her for trying to ensure that her company, a contractor who provides product to the public and private sectors, was not selling substandard or defective material. *See*, e.g., https://www.cablecomponents.com/defense/#:~:text=CCG's%20extrusions%20and%20compounds%20are,such%20as%20ships%20and%20submarines (last accessed April 23, 2026) ("CCG provides defense OEMs with products that can be used on military and naval vessels such as ships and submarines.").[1]

4.      Shortly after awarding Ms. Russell a stellar performance review and substantial bonus for outstanding work, they terminated her employment in August 2024, not for performance issues, but right after she disclosed a need for protected medical leave. The timeline is damning: whistleblowing activities began in April and May 2024, retaliation escalated through

---

[1]      The product at issue that resulted in Ms. Russell's complaints was shipped to a private company.  However, on information and belief, that company has contracted with the federal government and/or worked on federal projects.  It is well-known, per Defendants' website and marketing material, that their cable components are used by public and private companies in connection with critical public infrastructure. Plaintiff does not have specific knowledge regarding whether the manufactured components at issue were ultimately being used by this prime contractor for a private, quasi-public, or public project.  Regardless, Defendants' products are used in a variety of critical modern infrastructure, whether public or private.  She expressed repeated concerns about the product integrity, as set forth below.

the summer, and termination occurred within days of her requesting medical accommodations for the very condition Defendants' hostile conduct had aggravated.

5.　　Indeed, in Ms. Russell's first quarter of 2024 performance review, issued shortly before her whistleblowing activity and signed by the individual who would initiate her termination, CCG's President wrote that her "OVERALL RATING" "EXCEEDS" expectations and in one category where she was found to be meeting expectations he wrote "I anticipate that she will be exceeding in this category for **2025**." (emphasis added).  In other words, as of the first quarter of 2024, a retaliatory actor in this case himself applauded Ms. Russell's performance and expressly wrote he expected her to continue in her role into 2025.  **What changed?** Weeks later Ms. Russell's protected activity began.  She then found herself out of a job, for blatantly pretextual reasons, in the coming months.

6.　　This corporate vendetta against a conscientious executive demands accountability and robust remedies to vindicate Plaintiff Russell's rights and to deter similarly unconscionable conduct moving forward.  Accordingly, Ms. Russell hereby asserts claims for Defendants' violations of Connecticut General Statutes § 31-51q, wrongful termination contrary to public policy, and interference with and retaliation for exercising Family and Medical Leave Act rights.[2]

## II.　　JURISDICTION AND VENUE

7.　　This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[2]　　Plaintiff also timely filed a charge of discrimination with the EEOC, which was administratively transferred to the CHRO for investigation.  Upon receipt of her right to sue letter from the CHRO, she will seek to amend her complaint to add disability discrimination and retaliation charges under state and federal law.

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims arising under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Cable Components Group, LLC conducts substantial business activities in this District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## III.    PARTIES

10.     Plaintiff Lynne Russell is an individual and citizen of Rhode Island and a former employee of the Defendant employers.

11.     Defendant Marmon Holdings, Inc. is a corporation organized and existing under the laws of Illinois, with its principal place of business in Illinois.

12.     Defendant Cable Components Group, LLC is a limited liability company organized under the laws of Connecticut, with its principal place of business in Connecticut, and is a wholly owned subsidiary of Defendant Marmon Holdings, Inc.

13.     During her employment, Plaintiff worked at Cable Components Group, LLC's Pawcatuck, Connecticut location.

14.     At all times relevant hereto, Defendants operated as a single or joint employer and are collectively called "Marmon" or "Defendants."  Indeed, as one example, Marmon's General Counsel, Daniel Hanrahan, signed CCG's 2025 Annual Report with the State of Connecticut as a representative or agent of CCG.

## IV.    FACTUAL ALLEGATIONS

### A.  Ms. Russell's Employment and Stellar Performance

15. Ms. Russell is a highly accomplished sales and marketing executive with extensive experience in the manufacturing industry.

16. Around November 2022, Defendants recruited Ms. Russell to serve as Senior Sales Manager. During her interview, she met with Charles Clement, the former President and General Manager of Defendant CCG. Since that time, Mr. Clement was promoted to a position directly with Marmon. Indeed, Mr. Clement has worked in various roles for Marmon and its related entities for more than a decade, and he is an example of the integrated operations model that Marmon has extended across its organizations.

17. As a condition of employment, Ms. Russell was required to sign a code of business ethics.

18. Around June 2023, Ms. Russell was promoted to Vice President of Sales and Marketing, a crucial executive position responsible for managing key client relationships, ensuring customer satisfaction, and promoting business growth.

19. Ms. Russell's role required her to maintain relationships with major customers. Her job required her to communicate customer specification and quality standards to Defendants to retain customers and grow revenue.

20. In the first quarter of 2024, Ms. Russell received a stellar performance review in which she was found to exceed expectations.

21. Her performance review provides that "Lynne is a role model for trustworthiness and resiliency in this organization. We are building an organization around high character individuals and she is central to our culture shift."

22. Also in March 2024, Ms. Russell was awarded a substantial $45,000 bonus for her outstanding work.

23.     Her performance review expressly stated she was exceeding performance overall and that in the one area where she was found to be meeting (but not exceeding) expectations, the then President of CCG wrote he expected her to be exceeding in that category in 2025.  In other words, Defendants fully anticipated Ms. Russell to continue in the role she had been performing at an exceeding expectations level.

24.     Both Defendant companies were performing well financially during Ms. Russell's employment, with no legitimate business justification for eliminating her essential executive position.

25.     Defendants operated as joint employers through their interrelated operations, common management, centralized control of labor relations, and integrated business functions. For example, Ms. Russell worked via Marmon's intranet and internal platforms, was required to comply with Marmon company policies, and she and other colleagues received information and training directly from Marmon.

26.     Indeed, the employee handbook produced by Defendants at the CHRO,  identified as governing Ms. Russell's employment, expressly opens with a "Message from Marmon Holdings, Inc. Chairman," welcoming employees to Marmon and describing Marmon as the overarching organization within which CCG operates. The handbook repeatedly references Marmon Holdings, Marmon policies, and Marmon corporate values, and identifies Marmon — not CCG alone — as the source of key employment policies, compliance requirements, and ethical standards.

27.     Defendants' integrated IT infrastructure meant that Ms. Russell's work computer, email account, and access to business systems were administered through Marmon Holdings' central IT department.

28.    Indeed, Cable Components Group, LLC was required to comply with all Marmon Holdings, Inc.'s human resources policies, employment policies, and procedures, including whistleblower protection policies. On information and belief, Cable Components Group's Human Resources function reported directly to and was supervised by Marmon Holdings' corporate human resources department.

29.    Cable Components Group employees, including Ms. Russell, received employment training materials, policy updates, and guidance from Marmon Holdings. The companies maintained fully integrated information technology infrastructure and day-to-day operations, with shared systems for email, document management, and business records. Marmon Holdings exercised centralized control over Cable Components Group's employment decisions, whistleblower procedures, and employee relations matters.

30.    Cable Components Group's human resources representative, Seraphine Gaulin, reported directly to Marmon Holdings' corporate HR department and was required to follow Marmon Holdings' employment policies and procedures for all personnel actions.

31.    Ms. Russell's employment was governed by Marmon Holdings' employee handbook, code of business ethics, and corporate policies, which Cable Components Group was required to implement and enforce.

**B. Ms. Russell's Protected Whistleblowing Activities**

32.    In April 2024, just weeks after receiving her stellar performance review and bonus, Ms. Russell was contacted by the Head Engineer of a major customer of Defendants, who complained about serious product defect concerns.

33.    This customer advertises using cable products in, *inter alia*, power grids and digital and electrical platforms serving the public at large.

34.    The Head Engineer of Defendants' client reported that Defendants' products were not functioning properly, with specific issues identified that raised concerns about product safety and material quality.

35.    The Head Engineer for the client asked Ms. Russell to look into the issue and to inquire regarding certain manufacturing protocols as it related to the underlying product.

36.    When Ms. Russell investigated this customer complaint, she discovered systematic quality control violations and apparent corporate cover-up efforts.

37.    Cable Components Group's President, Charles Glew, instructed Ms. Russell to provide the Head Engineer with inaccurate information regarding the underlying manufacturing practices that had been employed in this instance.

38.    As part of her inquiry into the client's concerns, Ms. Russell also discovered that Defendants were manufacturing products using non-commercial/non-certified materials that did not reflect the prime material codes shown on quote templates used to quote materials to customers.

39.    On information and belief, this practice created serious risks of immediate or long-term product failure, as Defendants' products were being used by major cable companies to support critical technology and infrastructure.

40.    When the customer switched to a competitor's materials, the problems immediately disappeared, (as stated by the Head Engineer) confirming that Defendants' materials were likely or may have been an issue.

41.    In another product shipment review, Ms. Russell discovered that Defendants were supposed to use 100% of the customer's provided material but had instead mixed in non-commercial/non-certified (unapproved) materials in the manufacturing process.

8

42.    In May 2024, Ms. Russell presented her findings to Cable Components Group's President, showing proof that Defendants were deceiving customers by failing to follow precise engineering formulas and shipping products that violated customer specifications.

43.    Rather than addressing these violations, Mr. Glew became hostile, stating he had "never had a salesperson question all my decisions" (or words to that effect).

44.    Mr. Glew dismissed Ms. Russell's concerns and stormed out, refusing to investigate these product integrity, safety, and legal issues.  Instead, he became defensive and dismissive in stating that the production team was doing the best they could with a newer product line (that he developed or contributed to).

45.    Later that day, Mr. Glew stopped by Ms. Russell's office and asked her if she "was aware of the death of the second Boeing whistleblower," (or words to that effect) which Ms. Russell interpreted as intimidation.

46.    Ms. Russell then contacted Cable Components Group's VP of Operations, Michael Kidd, to report the quality control violations.

47.    During a Zoom call with Mr. Kidd and Cable Components Group's Head of Engineering, Sasha Ghanbar, Ms. Russell showed production spreadsheets demonstrating that Defendants had shipped products that did not follow required formulas.

48.    The VP of Operations became defensive, refused to discuss the issues, and hung up on Ms. Russell.

49.    After Ms. Russell reported the quality control violations to the VP of Operations, someone began loudly banging on her office door while she was still on the Zoom call.

## C. Defendants' Retaliatory Actions

50.    Following Ms. Russell's whistleblowing activities, Defendants engaged in escalating retaliation designed to intimidate and silence her.

51.    Defendants froze Ms. Russell out of previously scheduled collaborative operations and quality control meetings when the VP of Operations cancelled all future regularly scheduled meetings with Ms. Russell and never rescheduled them.

52.    On May 9, 2024, Ms. Russell noticed that a quote template usually stored in a quote template folder, confirming the required prime material selection and costs, had seemingly gone missing from Defendants' IT system.

53.    When Ms. Russell sent a written request for IT assistance to recover the missing file containing detailed raw material formulas, she got no response.

54.    The file at issue was initially missing altogether.  Several weeks later, the file reappeared but had been altered.  The detailed raw material specifications that could expose the quality control violations had been replaced with generic cost information that concealed the specific product composition and issue.

55.    This apparent tampering with business records demonstrated Defendants' effort to conceal the quality control violations Ms. Russell had reported.

56.    In June 2024, while attending the Wire Expo at Mohegan Sun, Cable Components Group's President made statements about Ms. Russell to her colleague Lori, stating that "Lynne better stay in her lane and keep her nose out of other people's business, and it would be very bad for her career if she doesn't" (or words to that effect).

57. These threats were communicated to Ms. Russell by Lori upon her return from vacation on June 19, 2024, creating a climate of fear that impacted her health and emotional well-being.

58. On July 31, 2024, Ms. Russell reported serious security concerns to Mr. Glew, telling him that she was unable to control her phone, was concerned her Gmail had been compromised, and that there were suspicious events relating to her use of technology that raised security concerns.

59. The stress of concerns of retaliation and the security issues with her personal privacy resulted in a flare-up of her medical condition, lupus.

**D. Ms. Russell's Disability and FMLA Request**

60. Ms. Russell suffers from systemic lupus, a chronic autoimmune condition that during times of stress causes extreme exhaustion and debilitation that substantially limits major life activities, particularly during flare-ups.

61. The ongoing retaliation and hostile work environment caused by her whistleblowing activities and recent privacy concerns severely exacerbated Ms. Russell's medical condition.

62. The combination of workplace retaliation and compromised personal privacy caused severe stress that triggered a significant flare-up of her lupus condition.

63. On August 5, 2024, Ms. Russell was forced to call out sick due to extreme stress and lupus-related health impacts aggravated by the hostile work environment.

64. Via text message, Ms. Russell notified Defendants' Human Resources representative, Seraphine Gaulin, that she needed to take sick time and would be out at least a few days.

11

65.    On August 8, 2024, while still on sick leave, Ms. Russell called Ms. Gaulin and left a voicemail, then followed up via text message and expressly requested FMLA paperwork, indicating that she had a qualifying serious health condition requiring protected leave.

### E. Defendants' Unlawful Termination

66.    On August 9, 2024, four days after Ms. Russell disclosed her need for sick time and one day after her request for FMLA paperwork, Defendants terminated Ms. Russell's employment.

67.    Defendants called Ms. Russell into a meeting with Defendants' HR representative and Cable Components Group's President, where they told her they were allegedly eliminating her position and terminating her employment immediately.

68.    During this termination meeting, the President made a telling admission, stating that "it is kind of an uncomfortable situation, but we had planned this, this had been in the works for a while" (or words to that effect).

69.    Given that Ms. Russell received a stellar first quarter performance review and substantial bonus in March 2024, just weeks before her protected activities began, any decision to terminate her could only have been made in response to her numerous protected activities.

70.    Moreover, on information and belief, the decision to abruptly terminate Ms. Russell for her whistleblowing activities was hastily expedited when the company learned she needed to take medical leave and receive accommodations.  It defies belief to conclude anything otherwise based on the specific timeline here.

71.    Ms. Russell was given no notice, was not cited for any performance issues or disciplinary actions, and was not permitted to assist with any transition.

72.     Instead, this case concerns the targeting of an experienced executive who experienced numerous forms of retaliation in response to her protected activity.  In a nutshell, the timeline is as follows:

   a. Ms. Russell hired in approximately November 2022.

   b. She is promoted in approximately June 2023.

   c. Defendants' business is performing well, and she receives a bonus of $45,000 in March 2024 for her contributions.  Defendants forecast a future with Ms. Russell performing her role well in 2025.

   d. In April 2024, one of Defendants' customers raises concerns with Ms. Russell directly that she begins to investigate and report to Defendants.

   e. From May 2024 through the summer of 2024, retaliatory conduct escalates, as set forth above.

   f. Ms. Russell's medical condition, Lupus, is aggravated by Defendants' retaliatory conduct and she takes sick leave.

   g. While on sick leave, she expressly requests FMLA paperwork from HR who never provided it to her.

   h. Instead, while still on sick leave, she is abruptly terminated.  On information and belief, Defendants accelerated their retaliatory plans when they learned she was planning to take medical leave.  The expedited timeline was in direct response to her protected requests for medical leave and accommodations.

73.     The stated reason for termination, position elimination due to business necessity, was pretextual, as both companies were performing well financially and there were no legitimate business reasons for eliminating a key executive position.

## V.   CAUSES OF ACTION

### COUNT I: VIOLATION OF CONNECTICUT FREE SPEECH PROTECTION

*(Connecticut General Statutes § 31-51q - Against All Defendants)*

74.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

75.    Connecticut General Statutes § 31-51q protects the free speech rights of employees, prohibiting employers from taking disciplinary action against employees for exercising rights guaranteed by the First Amendment to the United States or Connecticut Constitutions.

76.    Ms. Russell's reports about quality control violations and product integrity concerns constitute protected speech about matters of public concern.

77.    Ms. Russell's speech did not interfere with her job performance, as ensuring product quality and customer satisfaction were central to her role as Vice President of Sales and Marketing.

78.    Defendants' retaliation and efforts to chill Plaintiff's speech undermine numerous federal, state, and local laws and regulations including but not limited to the regulation of public utilities, defense contractor protocols, and consumer product safety and critical infrastructure protection, including the Federal Power Act, 16 U.S.C. § 791a et seq., federal defense contracting standards; the Consumer Product Safety Act, 15 U.S.C. § 2051 et seq.; and Connecticut's public utility regulatory framework and consumer protection laws, Conn. Gen. Stat. §§ 16-1 et seq. and 42-110a et seq. Connecticut and federal public policy demands compliance with safety and product integrity standards in the defense contractor context. *See*

generally *Faulkner v. United Techs. Corp., Sikorsky Aircraft Div.*, 240 Conn. 576, 583, 693 A.2d 293, 296 (1997).

79.     Defendants violated Connecticut law by terminating Ms. Russell for exercising her constitutional right to report matters affecting data infrastructure, communications and consumer welfare.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages, lost wages, benefits, emotional distress damages, punitive damages, prejudgment interest, costs, and attorneys' fees.

## COUNT II: WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

*(Against All Defendants – In the Alternative)*

80.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

81.     Under Connecticut law, an employee may maintain a wrongful discharge action when the termination violates a clear mandate of public policy.

82.     Ms. Russell was terminated for refusing to mislead customers about product quality and integrity, and for reporting systematic quality control violations that risked product failure in data infrastructure through ethernet cables.

83.     Ms. Russell's whistleblowing activities invoked Connecticut's strong public policy interest in protecting the public from defective and unreliable products and preventing corporate fraud.

84.     Indeed, Defendants' retaliation and efforts to chill Plaintiff's speech undermine numerous federal, state, and local laws and regulations including but not limited to the regulation

of public utilities, defense contractor protocols, and consumer product safety and critical infrastructure protection, including the Federal Power Act, 16 U.S.C. § 791a et seq., federal defense contracting standards; the Consumer Product Safety Act, 15 U.S.C. § 2051 et seq.; and Connecticut's public utility regulatory framework and consumer protection laws, Conn. Gen. Stat. §§ 16-1 et seq. and 42-110a et seq.  Connecticut and federal public policy demands compliance with safety and product integrity standards in the defense contractor context. *See generally Faulkner v. United Techs. Corp., Sikorsky Aircraft Div.*, 240 Conn. 576, 583, 693 A.2d 293, 296 (1997).

85.     Defendants' stated reason for termination was pretextual, as shown by the temporal proximity between Ms. Russell's protected activities and her termination, her stellar performance review just weeks before the whistleblowing, and the overall circumstances surrounding her termination.

86.     Defendants' conduct violated Connecticut's public policy protecting whistleblowing employees and consumers from corporate fraud and defective products.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages, lost wages, benefits, emotional distress damages, punitive damages, prejudgment interest, costs, and attorneys' fees.

## COUNT III: INTERFERENCE WITH FAMILY AND MEDICAL LEAVE ACT RIGHTS

*(29 U.S.C. § 2601 et seq. - Against All Defendants)*

87.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

16

88.     Ms. Russell's request for FMLA paperwork demonstrated that she had a qualifying serious health condition requiring protected leave under the Family and Medical Leave Act.

89.     Defendants are covered employers under the FMLA and were required to provide Ms. Russell with protected leave.

90.     Defendants' termination of Ms. Russell right after her FMLA request constitutes interference with her FMLA rights and retaliation for seeking to exercise those rights.

91.     When the President realized that Ms. Russell was planning to take FMLA leave, he escalated his retaliatory actions and timeline to interfere with her FMLA rights.

92.     The temporal proximity between Ms. Russell's FMLA request and her termination, combined with the pretextual nature of Defendants' stated reasons, establishes clear FMLA violations.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages, lost wages, benefits, liquidated damages, prejudgment interest, costs, and attorneys' fees.

## COUNT IV: RETALIATION UNDER THE FAMILY AND MEDICAL LEAVE ACT

*(29 U.S.C. § 2601 et seq. - Against All Defendants)*

93.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94.     Ms. Russell engaged in protected activity under the FMLA by requesting FMLA leave for her serious health condition.

95.     Defendants terminated Ms. Russell because of her protected activity under the FMLA.

96.    Defendants' decision to terminate Ms. Russell was motivated by her request for FMLA leave and was designed to prevent her from exercising her FMLA rights.

97.    Defendants' conduct constitutes unlawful retaliation under the FMLA.

**WHEREFORE,** Plaintiff demands judgment against Defendants for compensatory damages, lost wages, benefits, liquidated damages, prejudgment interest, costs, and attorneys' fees.

## VI.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

**A.** Enter judgment for Plaintiff and against Defendants on all counts;

**B.** Award Plaintiff compensatory damages in an amount to be determined at trial;

**C.** Award Plaintiff lost wages, benefits, and other economic damages;

**D.** Award Plaintiff front pay;

**E.** Award Plaintiff liquidated damages where permitted by law;

**F.** Award Plaintiff damages for emotional distress and mental anguish;

**G.** Award Plaintiff punitive damages in an amount sufficient to punish Defendants and deter similar conduct;

**H.** Award Plaintiff prejudgment interest;

**I.** Award Plaintiff reasonable attorneys' fees and costs; and

**J.** Grant such other and further relief as this Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: April 24, 2026                    Respectfully submitted,


_/s/ Zachary L. Rubin_
Zachary L. Rubin, Esq. (ct30192)
ZLR Litigation, PLLC
456 Glenbrook Rd, Suite 11 #638
Stamford, CT 06906
       _and_
4 International Drive, 1st Floor
Rye Brook, NY 10573
(203) 212-9983
zach@ZLRlitigation.com


_Plaintiff's Attorney_